COMMERCIAL MANUF'G Co., Consolidated, and another, v. FAIRBANK CANNING Co.[1]

(*Circuit Court, N. D. Illinois.* March 22, 1886.)

1. PATENTS FOR INVENTIONS—IDENTITY OF PATENTED PROCESSES.

In a suit for infringement of reissued letters patent No. 10,137, of June 13, 1882, to complainants, as assignees of Hippolyte Mege, for an improved method of treating animal fats, *held*, that the invention covered by this patent was identical with that described in a Bavarian patent, which expired April 8, 1876, and in an Austrian patent, which expired May 26, 1876, both to the same inventor, and that the American patent expired with said foreign patents, prior to the beginning of this suit.

2. SAME—ESTOPPEL.

Where it was urged that patentee had estopped himself to deny that his American patent was for the same invention as patented to him in prior foreign patents, after having represented that to be a fact in his application for the former, *held*, that if the inventor was laboring under a mistake as to this point, his rights should not thereby be prejudiced.

3. SAME—TEST TO DETERMINE IDENTITY OF PATENTS.

A fair test to determine whether an American patent is identical with or included in a prior foreign patent to the same inventor is to inquire whether the use of the precise process described in the foreign patent, after the grant of the American patent, would be enjoined as an infringement of the latter.

In Equity.

*Offield & Towle,* (*B. F. Thurston* and *T. D. Lincoln,* of counsel,) for complainant.

*Hill & Dixon,* for defendants.

Heard before GRESHAM and BLODGETT, JJ.

BLODGETT, J. This suit was brought for an alleged violation of reissued patent No. 10,137, granted June 13, 1882, to complainant, assignee of Hippolyte Mege, for "an improved method of treating animal fats," the original patent having been granted December 30, 1873, and reissued May 12, 1874, and again reissued September 24, 1878, before the reissue now in question. By the specifications it is claimed that Mege invented an improved means for transforming animal fat into butter; the process described resulting in artificially producing the natural work which is performed by the cow when it reabsorbs its fat in order to transform the same into butter. His process included nine steps, the first five of which only are in controversy in this case. Briefly stated, these steps are as follows:

(1) Neutralization of the ferments or germs of decay, which is done by plunging the suet or raw fat, as soon as possible after the death of the ani-

---

[1] Reported by Charles C. Linthicum, Esq., of the Chicago bar.

mal, into water containing 15 per cent. of sea salt, and 1 per cent. of sulphite of soda, where it was to remain not less than one hour, nor more than twelve hours.

(2) The raw fat or suet is then completely crushed, by passing it between cylinders, and from them under mill-stones, which completely bruises all the cells.

(3) This crushed fat is then placed in a vessel of well tinned or enameled iron or baked clay, and this vessel is placed in a water bath. To about 100 kilogrammes of fat there are added two liters of artificial gastric juice, made by macerating, for three hours, half the stomach, well washed, of a pig or sheep, with three liters of water, and thirty grams of biphosphate of lime. The temperature of the mass of fat and gastric juice thus contained in the vessel is then slowly raised to about 103 deg. Fahrenheit, (which is the temperature of the stomach of domestic animals from which fats are obtained,) and kept at that heat until the fatty matter is completely separated from the tissue in which it is held. When this accomplished, about one kilogramme of powered sea salt is added to each hundred kilogrammes of fat, and the mass thoroughly stirred for about one quarter of an hour, when the clear fat is drawn off. The fat thus drawn off must not have any taste of fat, but, on the contrary, must have the taste of molten butter.

(4) The molten fat thus obtained is placed in a vessel, and this vessel placed in a water bath, where it is surrounded by water which is kept at a fixed temperature of 80 deg. Fahrenheit, for the soft fats, or 98 deg. Fahrenheit for the harder fats, such as mutton fats, where the vessel remains until the stearine of this molten fat is crystallized, or deposited in the form of teats, in the middle of the liquid mass. The stearine having become hardened or crystallized, the oleomargarine remains mixed with it in a liquid or semi-liquid condition.

(5) The mass is then placed in a centrifugal machine or hydro-extractor, and the machine set in motion. The liquid oleomargarine is thrown off by the centrifugal force, while the hard stearine is retained in the cloths. A press may also be used for the purpose of separating the oil from the stearine, especially if the fat used is very soft.

The patentee says the product of these steps in the process is a greasy matter of very good taste, which may replace the butter in the kitchen, where it is employed under the name of margarine, but that it may be transformed into more perfect butter by subsequent steps, which he describes, such as making the oil into an emulsion, with a certain quantity of fresh cream and pepsin obtained from the mammary glands of a cow; but, as this part of the process is not now in question, it is needless to give it in further detail.

The claims of the patent are:

"(1) The improved material herein described, produced by treating animal fat so as to remove the tissues and other portions named, with or without the addition of substances to change the flavor, consistency, or color, as set forth. (2) The process herein described, of treating animal fats in the production of oleomargarine."

The claims of the present reissue being substantially the same as those of the original patent; that is, after two reissues, in which different claims were made from those of the original patent, the owners of the patent have by this reissue gone back to the original claims.

The defenses interposed are (1) that the patent had expired, before

the last reissue thereof, by reason of the expiration of certain foreign patents granted to Mege for the same invention; (2) that the present reissue, if it has not expired, is otherwise invalid because of the surrender of the original patent, and taking two reissues, with new and different claims, on the ground that the original was defective, and did not describe the invention, and that the patentees are now estopped from returning to the original specifications and claims as their patent; (3) that the defendants do not infringe the process described in the reissued patent.

It is conceded that Mege, who was a scientist of much merit and repute in France, some years before the application for his patent in this country, set about a series of experiments for the purpose of obtaining healthful and yet cheaper fat for the use of working people in that country, in the place of the poor butter then used by them, or to take the place of butter which they were not able to buy; and, as the result of such experiments, he discovered that the fat of beef animals and the fat of butter were substantially identical. Of the utility of Mege's discovery Prof. Henry Morton, president of the Stevens Institute of Technology of New Jersey, whose testimony is found in the record, says:

"There is, of course, a difference in the improved product described and claimed in the Mege patent, according as it is made with or without the addition of materials affecting its color, consistency, and flavor. I will therefore refer to each of these conditions separately. When the improved product of Mege, without these additions referred to, is compared with ordinary dairy butter, we find it to be substantially identical therewith, as regards its main constituents and its general consistency and character. Both products then consist substantially of mixtures, in nearly the same proportions in either case, of stearine, margarine, and oleine, and both are unctuous solids, varying in consistency, being quite solid near the melting point of ice, quite fluid at a temperature of about 90, and more or less soft and plastic at intermediate temperatures. The Mege product, however, differs from dairy butter, in the first place, as to its composition, by reason of the presence in the dairy butter of several substances not found in the Mege product. Thus the dairy butter contains about five per cent. to six per cent. of the peculiar fat known as butyrine. It also contains a smaller amount of casein; some trace of albumen; also extremely minute quantities of caprilin, caproilin, and caprylin. None of these substances would be present in the Mege product above referred to, which would therefore lack the peculiar flavor due to the presence of these products. The amount of water and salt would also, as a rule, be greater in dairy butter than in the Mege products. There would also be a difference in consistency, inasmuch as the dairy butter would not constitute a homogeneous mass of fatty substance, but would be a solid emulsion of such fatty substance, in which the same existed as minute spheroids or particles of the said fatty substance, separated from each other by aqueous fluid, consisting of water, holding in solution salt and traces of albumen and casein. When the Mege product has been converted into a more perfect butter, as he calls it, by the addition of certain substances as indicated by him, it will then contain all or nearly all of the materials found in dairy butter, though not exactly in the same proportions; all these distinctive matters being, as a rule, present in smaller proportions in the Mege product than in the dairy butter. * * * As articles of food, the Mege product and ordinary dairy butter are

only distinguishable by characteristics which are variations of degree. Thus the Mege product in its simplest form would have less flavor and a less agreeable consistency than good dairy butter; while, on the other hand, its freedom from disagreeable flavor would render it superior to a low or poor grade of dairy butter. When the flavoring materials were added, the Mege product would then be extremely difficult to distinguish from the best dairy butter; but, as compared with a very fine and highly-flavored dairy butter, would be lacking in flavor. As regards wholesomeness, I do not think there would be any difference between the Mege product, in either of its conditions, and ordinary good dairy butter, though the Mege product would be the better in this respect than a strong or rancid quality of dairy butter. The same remark applies to the nutritiousness of the materials compared; while, as regards palatableness, the Mege product would, I think, hold an intermediate place between the highest and the lower grades of dairy butter, being better than the low grades, and not quite equal to the highest, in this respect."

Upon the process for utilizing his discovery, Mege obtained foreign patents as follows: In France, July 15, 1869, for 15 years; in England, on July 17, 1869; in Austria, on October 31, 1869, which expired May 26, 1876; and in Bavaria on April 8, 1873, which expired April 8, 1876. The application for the issue of the patent in the United States was made December 13, 1873.

Under the first point raised by the defense, it is now insisted that the patent granted to Mege in this country had expired in this country before this suit was commenced, pursuant to the terms of section 4887, Rev. St., because the Bavarian and Austrian patents having expired in 1876, therefore that this patent, being for the same invention, expired at the same time; while it is contended on the part of the complainant that the American patent now before us is for a process different from that described in the foreign patents, and stands as an independent patent, to run 17 years from the date of the original patent.

It is urged on the part of the defendants that Mege has estopped himself from denying the identity of the American and foreign patents—*First*, because his attorney, Mr. Seward, in his letter to the commissioner of patents of October 31, 1869, inclosing the application of Mege for the United States patent, says: "I am informed that a French patent for this process was issued to Mr. Mege, October 2, 1869." *Second*. Because Mege, on making the application for his patent in this country, made and filed in the patent-office an affidavit in which occurs the following statement:

"I am the inventor of the improvement for transforming animal fats into butter, referred to in said application; that French letters patent were duly issued to me therefor on the fifteenth day of July, 1869, and that I have caused the above application to be made for the issuance of letters patent for the United States for the said improvement."

We think there can be no doubt from the proofs in the case that both Mege and his solicitors, who are men of high standing in their professions, thought, at the time the original patent was applied for, that they were covering the substantial process which Mege had pat-

ented abroad; but if these parties were laboring under a mistake, their rights ought not to be defeated, or seriously abridged, by such mistakes, and we therefore feel compelled to examine the proof as to the identity of the foreign and American patents. We have already stated the steps in the process of the American patent, and a comparison of these with the foreign patents will, as it seems to us, best settle this question of the identity between this patent and Mege's foreign patents. Mege's Bavarian patent was granted April 8, 1873, and in his specifications he says:

"The new modes of procedure described therein consist both of chemical and physiological processes. * * * They are especially intended to benefit the navy, and the less wealthy classes, by furnishing excellent edible and preservable fats at a price considerably lower than that of present similar products; for instance, butter and the finer grades of fat. * * *

"The new procedure depends on the following conclusions of modern science: (1) That the malodorous, colored, acid, and rancid ingredients are not originally contained in the crude fats, as they occur in nature; (2) that those harmful substances are developed by activity of the organized tissues under the influence of fermentation, heat, and chemical agents; (3) that the fats of milk, termed 'butter,' consist only of the intermediate fat, which is altered by a cellular tissue, and then by the organizing tissue of the udder. By utilizing these principles in industrial pursuits or in domestic economy, there is obtained from the crude fat and the tallow (a) a pure fat, without the customary fatty smell and taste, which does not stick to the palate, and which resembles the fatty qualities most desired for eating purposes; (b) stearine for candles; (c) as a residue, common tallow; (d) this fat, really identical with the fat of butter taken from its source before it has been changed in the milk gland, can be made into different kinds of butter, which, although prepared by an artificial process, is really butter, and differs only from the ordinary butter by keeping fresh for a much longer length of time. The means employed in the preparation of these partly new, partly old, products, constitute, in their details and in their entirety, the invention, which we claim as our property. They are as follows:

"(1) Washing and crushing. The crude fat is exposed to a jet of cold water, between the conical cogs, of two iron cylinders. It is finely subdivided by the current of water and the pressure, and falls thence into a tank, where a current of cold water completes the washing. (2) Artificial digestion. This fat, now freed from all soluble animal substances, is mixed with artificial gastric juice (stomach of the pig or sheep in acidulated water) to the extent of immersing it completely, or to 1,000 kilo of fat, 300 kilo of water, 1 kilo of bicarbonate of sodium, and two stomachs (pig or sheep) are added. This mixture is then kept at the temperature of the animal body (by means of steam-pipes or otherwise) until all the molten fat has been dissolved by the pepsin, (the stomachs,) and appears in a clear layer on the surface. It is allowed to settle, or it is decanted, and the process repeated, in order to extract all the fatty constituents, which now have lost the odor of animal fat, and have obtained a particular taste. The residue is tallow. (3) Cooling. The fluid fat is poured into vessels which have an opening at the bottom, and contain a layer of tepid water. They are covered, and, when crystallization has occurred in consequence of cooling, the water is drawn off from the opening, and the vessel is inverted, and the cake is allowed to fall on a table. (4) Pressure. This operation is intended to separate the hard constituent, which makes the fat granular, congeal rapidly and stick to the palate. The cooled fat is cut into slices about one inch thick, and put into a cloth between

hot plates of a press. The portion which runs off is a mixture of margarine and oleine, resembling lard in composition, and of about the taste of fresh butter. The solid residue, taken out of the cloth, is good stearine, fit for making candles immediately."

Here we have the directions of the Bavarian patent for producing the Mege product, consisting, "first, of crushing between cogged cylinders, and washing, by which it is finely subdivided." The American patent says: "A complete crushing is necessary under millstones." So that it would seem there is only a difference in degree in the Bavarian and American processes as to the crushing. The American process says the fat must be completely crushed, so as to bruise all the cells; the Bavarian patent says it is to be finely subdivided by the current of water, and by crushing between the conical cogs of iron cylinders. In both patents, Mege uses the word "crushing" as a title or heading for his directions. The directions for the artificial digestion are the same for the two patents, except that in the Bavarian he does not instruct specifically how to make the artificial gastric juice. He simply says it is "the stomach of a pig or sheep in acidulated water;" but the proof in this case shows that the mode of making artificial gastric juice was well known in the arts before the date of Mege's invention, and he undoubtedly assumed that the person who would attempt to use the process covered by his patent would have sufficient physiological and chemical knowledge and skill to make artificial gastric juice. The American patent also states that the fat, while in the process of digestion, is to be kept at a temperature of 103 deg. Fahrenheit; while the Bavarian patent says it is to be the temperature of the animal body; but the proof in this case shows that 103 deg. Fahrenheit is the temperature of the animal body, so it would seem there is no substantial difference between the processes of digestion described in the two patents. The third step in the Bavarian patent is entitled "Cooling;" the process of which is pouring the clear liquid fat into vessels which have an opening at the bottom, and containing a layer of tepid water, where they are covered, and remain until crystallization has occurred in consequence of the cooling. He does not give specific directions as to the temperature at which the fat is to be kept during the crystallizing process, but evidently leaves that to the skill of the operator, assuming that he will sufficiently understand, by the use of the word "crystallization," what the process must be. The next step after crystallization is the separation of the oleo and margarine from the crystallized stearine; and this, in the Bavarian patent, is accomplished by pressure between the hot plates of the press. Inasmuch as the centrifugal machine or the hydro-extractor and the press are equivalent devices for accomplishing the same results, that is, of expelling the liquid or fluid contents from the mass, there is no essential difference between the Bavarian and American patents in this step of the process. The Bavarian patent is also silent as to the neutralization of the ferments

or germs of decay; but it can hardly be possible that any person would enter upon the manipulation of animal fat without sufficient common knowledge and skill to know, without instruction by the specific terms of the patent, that, in order to produce sweet and pure oil or fat, the process of fermentation and decay must be prevented. So that, taking the Bavarian patent as a whole, there would seem to be such an identity in the processes described as to make them essentially the same.   Probably because Mege assumed that whoever would attempt the transformation of crude fats under his process in Bavaria would possess more knowledge or experience in regard to the handling of fats than he assumed would be known in this country, as a matter of general knowledge, he deemed it necessary in his American patent to give more minute and specific directions in regard to some of the steps of the process than he did in his foreign patents.   Yet we think there can be no doubt that he has substantially described the same process in both patents.

In the Austrian patent, issued to Mege, October 31, 1869, he describes the first process under the title of "Perfect Washing," which he says is done "by crushing the fresh fat, just taken from the animal, between rollers under a spray of fresh water."   The second step, "Artificial Digestion," consists in mixing the crushed fat with artificial gastric juice, (maceration of a pig's stomach in acidulated water,) in sufficient quantity to immerse it, and the mixture is kept at the temperature of the animal body until the fat appears in a clear layer on the surface.   Here we have the same process as in the American patent, except that the directions for crushing do not include grinding or crushing under millstones, and he gives no receipt for making artificial gastric juice except that of the maceration of a pig's stomach in acidulated water, which we must infer he assumed was a sufficient direction to enable an ordinarily intelligent person, skilled in the art of manipulating or handling fats, to make the gastric juice. The directions for crystallization require the clear fluid fat to be poured into a vessel with an opening at the bottom, and containing a layer of tepid water.   The vessel is then covered, and, when the cooling and crystallization have taken place, the cooled mass is turned out, cut in slices, and placed in canvas bags, and pressed between warm plates; by which method he says there is obtained about 60 per cent. of a fatty body, resembling butter, and identical in composition with lard, but free from odor, and of a perfectly pure taste.

The French and English patents give substantially the same description for the process as is contained in the Austrian and Bavarian patents.   All the steps of the American patent, with the exception of the neutralization of the ferments, are specifically called for and described, although perhaps not with all the minute directions which are found with the American patent.

All the proofs agree that Mege was a man of inventive genius and high scientific acquirements, and it can hardly be possible that if, be-

tween the time he took out the French, English, and Austrian patents in 1869, and the Bavarian patents in April, 1873, and the time when he applied for his American patent, in December, 1873, he had discovered any substantially new and material addition to the process covered by those foreign patents, he would not have specifically named and stated wherein the American differed from the foreign patents. As already said, it seems clear from Mege's own statements, and those of his solicitors, that the purpose was to cover by the American patent what had been covered by his French patent of 1869, and we cannot believe that, if anything in addition to this foreign patent had been intended to be introduced into the American patent, it would not have been stated in some explicit terms; and there can be no doubt that the French, Austrian, and Bavarian patents are substantially identical.

The scientific experts called by the complainant, Profs. Morton, Chandler, and Wheeler, have testified that they do not think the invention described in the American patent is found in either of the foreign patents. Their reasons for such conclusion, briefly summarized are: (1) That the crushing spoken of in the foreign patents is not so complete and thorough as that called for by the American patent, where the fat is to fall from cylinders under millstones, which shall completely bruise all the cells; (2) that in the American patent the digestion is to be accomplished with a less quantity of gastric juice than is called for by the foreign patents, as the foreign patents say the crushed fat is to be *immersed* in the artificial gastric juice; (3) that by the American patent the temperature may be raised above 103 deg. Fahrenheit, "so that the matters shall completely separate," while the foreign patents limit the degree of heat to the temperature of the animal body; (4) that in the foreign patents the process of cooling is allowed to proceed to such a point that the mass can be cut in pieces or slices, while in the American patent the product is not allowed to cool so as to become rigid, but is retained at a temperature of about 86.

With all due respect to the opinions of these eminent chemists, we must say that the points of difference suggested by their testimony are purely and wholly differences in degree. The necessity of crushing is stated in all the patents, both American and foreign. The degree of crushing would obviously affect the quantity of oil extracted from the fat by the process of digestion, as the only object of crushing is to release the fat from the tissues in which it is held in its natural condition. The necessity for thorough and minute comminution is one that would suggest itself from any operative's common knowledge. Any man who had intelligence enough to know the use of his own teeth would know the necessity of the complete comminution of any article to be subjected to the process of digestion or the action of the gastric juice. It would hardly require a scientist to instruct an operative that the more finely a substance is comminuted the more

direct and prompt would be the action of the gastric juice and the process of digestion.

As to the differences in the process of digestion between the American and foreign patents, it would seem to be true that the measured quantity of gastric juice directed to be used in the American patent is less than that called for in the foreign patents, because he gives specific directions as to the number of liters of gastric juice for 100 kilogrammes of fat in the American patent, while in the foreign patent he says the fat must be immersed in the gastric juice; but the proof shows that the formula for the gastric juice in the American patent gives a more potent and effective product, and we presume Mege may, by his experience and practice under his patents, have ascertained, at the time he took the American patent, that the process of digestion could be accomplished with a less quantity of gastric juice than was described in his first patents; but this is only a difference in degree; and with a larger quantity of gastric juice and not so complete comminution, about the same result would probably be obtained as with complete and thorough crushing of all the fat cells and a smaller quantity of gastric juice, especially if made stronger or more potent; so that the difference in the American and foreign patents in that regard seems to us wholly immaterial and unsubstantial.

As to the claim that these witnesses find in the American patent permission to raise the temperature above 103 deg. Fahrenheit, we do not think it is well founded, when the whole of Mege's specifications in his American patent are considered. Under the third head, "Concentrated Digestion," Mege says: "When the fat has descended in the vessel, he melted it by means of an artificial digestion, *so that the heat does not exceed 103 deg. Fahrenheit.*" Further on, in the same paragraph, he says: "He slowly raised the temperature to about 103 deg. Fahrenheit, so that the matter shall completely separate." Taking these two expressions together, it seems to us the first limits the second, and that the directions of the patent are specific not to raise the temperature above 103 deg. Fahrenheit. Certainly the language "I slowly raise the temperature to *about* 103 deg.," does not authorize raising the temperature above that point. When the distinction immediately before us is that it must not exceed 103 deg. Fahrenheit, and when we consider this language of the specifications in the light of the testimony in the case, which shows that gastric juice is destroyed whenever its temperature is raised much above 103 deg. Fahrenheit, we think there can be no doubt that the eminent scientist who devised this process intended to keep within the limits in which his gastric juice would be operative for the purposes of digestion.

The last and final distinction, that the foreign patents contemplated a cooling of the mass below 86 deg., or until it had become stiff so that it could be handled and cut before the pressure was ap-

plied, for the purpose of separating the oleomargarine from the stearine, is a distinction, as it seems to us, without a difference. If the stearine had become crystallized in the mass, although it might at one time have been cooled below 86 deg., when it was sliced and placed between the warm plates in the press the oleomargarine would again become liquid, and flow out under the action of the warm plates and the press, so as to secure the separation; and that such was the result is sufficiently established by the statements in the foreign patents, notably the Austrian and English, that about 60 per cent. of a mixture of the margarine and oleine, of a composition identical with lard, but of superior flavor, was obtained by the pressure, would seem to show, in the light of the proof in this case, that he obtained as large a product as is obtained by the process of the American patent.

A fair test of the question as to whether the American patent is anticipated by the foreign patents, or is included in them, we think would be, were a person in this country, after the issue of the present American patent, to commence the manufacture of oleomargarine by the precise process described in the Bavarian or Austrian patents, —supposing that process had not been patented abroad,—would the courts refuse an injunction to restrain the use of the process on the ground that it infringed that covered by the American patent? We can hardly deem it possible that any intelligent court would deny an injunction, if applied for under such circumstances, and we think this fairly illustrates the relation of the foreign to the American patent.

As to the question of infringement, it is stipulated in the record in this case that the defendant, in its factory, "first runs the fresh beef fat, which has been packed with ice during the preceding night, through a hasher, where it is thoroughly hashed and is comminuted; and then melts the hashed fat in a jacketed kettle at a temperature ranging from 120 deg. to 130 deg. Fahrenheit, the fat being thoroughly agitated by mechanical stirs while melting, and salt being mixed with the fat while it enters the kettle; and then, when settled, the melted fat is drawn off into other kettles, when the temperature is raised about 5 deg., and maintained about three hours; when the fat is put into seeders, which are kept in a room at a temperature of 84 deg. to 86 deg. Fahrenheit, until it granulates and thickens; when the stock is put into cloths holding three pounds each, in a flat cake seven by ten inches, and one inch thick. Eight of these are placed on an iron plate, and then an iron plate, in alternation, to 75 rows of cakes and plates, and put into a press. Then the oil is squeezed out by pressure in the press, and runs into a tank, from which it is pumped through pipes into a kettle in the same room and temperature, where it remains several hours, and is run into tierces.

The scientific experts for complainant say that this process is identical with that covered by the American patent; that the higher temperature at which the rendering or melting is done is the equiv-

alent of the digestion called for by the patent; and that the process of crystallization, or seeder and separation by pressure, are substantially the same.

We do not think it necessary to decide whether the process used by the defendant, and that covered by the patent, are identical, or substantially so, because our view of the first question raised by the defendant must be decisive of the case; but it would seem to the uninitiated certainly that there is room for a wide difference between the physiological process which Mege describes and directed should be pursued, and the mere rendering process at a low temperature which the defendant followed. A reading of Mege's several patents, with his introductory remarks in regard to the nature and character of his invention, impresses us with the conviction that he thought his was a physiological process, and dependent on physiological principles; that this process of digestion, by means of artificial gastric juice, at the temperature of the animal body, was an essential step in the production of the article which he designed should take the place of butter; while all the witnesses in this case agree that the product of the defendant's process, while it is pure fat, is odorless and tasteless, which is not the product which Mege intended should result from the practice of his process, as he says the product of his process should have the taste of almonds or of fresh butter. Without, therefore, further discussing the question of infringment, we simply say that we find that the complainant's patent expired April, 1876, by the expiration of the Bavarian and Austrian patents. The bill is therefore dismissed for want of equity.